FILED

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### SOUTH BEND DIVISION

11 JUN -3 PM 3:39

STEPHEN R. LUDWIG, CLERK
U.S. DISTRICT COURT
FOR THE NORTHERN DISTRICT
OF INDIANA

SUSAN LYNCH,
MATH-U-SEE INDIANA, INC.,
LISA ANGLE and JIM ANGLE,

Case No.: 3:11CV 233

                    Plaintiffs,

v.

MATH-U-SEE, INC., STEVEN DEMME
and ETHAN DEMME,

                    Defendants.

---

## COMPLAINT

Plaintiffs, by their attorneys, for their Complaint against the Defendants allege as follows:

### I.    Nature of Action

1.    Plaintiffs were distributors of a line of home-schooling curriculum materials called "Math-U-See;" one of plaintiffs, Lisa Angle ("Angle"), was also the creator and author of large portions of the Math-U-See curriculum materials. This action concerns two sets of claims: First, the claims of all Plaintiffs to be made whole for the Defendants' bad faith, fraudulent and unlawful termination of their distributorships; and, second, Lisa Angle's claims to be made whole for Defendants' fraudulent infringement and misappropriation of her intellectual property. Because Defendants' conduct was deceptive and deliberately wrongful, Plaintiffs seek, in addition to actual damages and as warranted by law and punitive damages.

2.     In the early 1990's, the Defendant Steven Demme ("Steve Demme"), a high school mathematics teacher, developed a line of books and demonstrative materials for teaching mathematics called "Math-U-See." The curriculum was appropriate for, and eventually directed to, the home-school market, which was in its infancy. Because Steve Demme did not have the resources to sell his Math-U-See line on a national basis, he recruited individual representatives to find and sell to the few handfuls of parents that were home-schooling their children in those pre-Internet days. It fell to these representatives, or distributors (the terms are used interchangeably here, but will generally be referred to as "Reps"), to assume the risk and carry the burden of launching Steve Demme's new product line in a specialized, scattered and uncertain market.

3.     Steve Demme and Math-U-See, Inc. ("MUS") contracted in writing to appoint each distributor, including Plaintiffs, as distributors in their territories under a contract expressly renewable each year so long as the distributors performed the contract. Those agreements continued in effect and were never revoked, canceled or terminated until Steve Demme and Ethan Demme (the "Demmes") fraudulently and capriciously did so in 2010, as described below.

4.     From the time he began using distributors and continuing until as late as November of 2009, Steve Demme personally told them, over and over, orally and in writing, that he was committed to keeping them as distributors, or "Reps." He referred to this as the "Rep Model." In reliance on those representations and their renewable contracts, the Plaintiffs invested virtually all of their resources, time and energy in selling the Math-U-See curriculum, and gave up significant other opportunities that were more established and secure. Steve Demme and MUS knew of and encouraged Plaintiffs' dependence upon MUS for their livelihoods.

2

5.   Steve Demme further engendered Plaintiffs' trust and confidence so that they would deal with him and MUS on a confidential and fiduciary basis rather than on an arm's length basis. Steve Demme professed Christian values of honesty, constancy and the importance of family; he asserted that God had led him to the Rep Model; and he disclaimed that Math-U-See operated by conventional business principles, but instead was a shared and mutual enterprise doing God's work.   Plaintiffs relied on this trust and confidence and put their families and futures in the hands of Steve Demme and MUS and in his promises that they would always have the MUS line of products to sell.

6.   Also based on this trust and confidence, Lisa Angle, who has undergraduate and advanced degrees in mathematics, developed and wrote curriculum materials for Math-U-See, all in the belief that she would continue as a Math-U-See Rep for life.

7.   Because of Plaintiffs' and other Reps' efforts over more than 15 years, the market for the Math-U-See curriculum increased tremendously, and Math-U-See became a leading home-school mathematics curriculum used by tens of thousands of families throughout the United States and indeed the world. As a result of their efforts, the Plaintiffs had distributorships that sold hundreds of thousands of dollars of Math-U-See materials a year and that supported their families.

8.   In late 2009 and early 2010, in a series of fraudulent announcements, aided and abetted by Ethan Demme, Steven Demme ended the distributorships of the Reps in the United States. Initially, Steve Demme said that corporate headquarters was simply going to take over shipping for the Reps in order to free them up to develop their markets further, and that they would become more profitable. A couple of months later, he said that because of and changes in the landscape," all the Reps would become "employees" at some unspecified date in the future;

3

and that he was working on making sure everyone would get some kind of compensation and a future job with MUS. Two months later, with the assistance of Ethan Demme, in April, 2010, he announced that because of requirements to comply with certain credit card regulations ("PCI Compliance"), it was necessary to end the Rep Model by July 1, 2010. In short, the United States distributors, including the plaintiffs, would no longer sell Math-U-See materials; the Rep Model was over. All sales and shipping would be done from the corporate office; Reps no longer had a role in the company. In fact, however, that reason was false – PCI Compliance did not require elimination of distributors. One domestic distributor continued to service the special needs school market and overseas Reps continued to serve their markets. The truth was that the Demmes and MUS wanted to take the Reps' profits and their businesses.

9.    In or by June 2010, in pursuit of this end, the Demmes and MUS:

- Stopped shipping materials to Reps so they had nothing to sell, unless special exceptions were made;

- Redirected the Math-U-See "800" number so that when customers called, they got someone in MUS headquarters who took their order instead of the Rep that they knew and had been dealing with, often for years;

- Cut off and redirected Reps' email accounts so that customer communications went to corporate headquarters;

- Demanded that Reps return sales aids, including banners, table coverings and books, to MUS;

- Demanded that Reps turn over their databases, including customer lists, to MUS;

- Changed the company website so that customer orders were not directed to the distributors but instead went straight to headquarters.

10.   Steve Demme offered some Reps jobs doing customer service at the rate of $20 per hour, a pittance compared to the profits of a distributorship. When reminded of the renewable contracts, Steve Demme stated that there never was a contract; that the contracts had

been abandoned; that he was "not a contract guy;" that the representatives had "never had a business", and that he owed them nothing.

11.     Plaintiffs seek to recover the value of their lost distributorships as a result of Defendants' breach of contract, breach of fiduciary duty, wrongful termination, and other wrongs.  Additionally, Lisa Angle seeks to recover damages and to obtain injunctive relief for Defendants' wrongful infringement of her copyrighted works.

## II.     Jurisdiction and Venue

12.     This Court has subject matter jurisdiction of this action under 28 U.S.C. § 1332 because all of the parties are of diverse citizenship and the amount in controversy is in excess of $75,000; under 28 U.S.C. § 1331 because a federal question is raised pursuant to the Copyright Code, Title 17 of the United States Code, and pursuant to 28 U.S.C. § 1338, which grants the United States District Courts original jurisdiction over disputes concerning copyrights.

13.     Venue is proper in this district under 28 U.S.C. § 1391 because a substantial number of the acts complained of occurred here and MUS may be found here.

## III.     Parties

14.     Susan Lynch is a citizen and resident of the State of Indiana.  She began distributing Math-U-See curriculum materials in the State of Indiana in 1994 and in the State of Illinois in 1996, and continued until her distributorships were unlawfully terminated by Defendants in 2010.

15.     Math-U-See Indiana, Inc. is an Indiana corporation with its principal place of business within this District that is owned by Susan Lynch and through which she carried out her Math-U-See business.

16.     Lisa Angle is a citizen and resident of the State of Idaho who, with her husband Jim, served as an independent distributor for MUS beginning in approximately 1995 and continuing until 2010 when her business was summarily and arbitrarily terminated by Defendants. She is also the author of several sets of curriculum materials, described more fully below, that have been unlawfully copied and distributed by MUS and Steve Demme.

17.     Jim Angle is the husband of Lisa Angle and the co-owner and principal of the Angles' MUS distribution business. He is also a citizen and resident of the State of Idaho.

18.     Math-U-See, Inc. ("MUS") is a Pennsylvania corporation with its principal place of business in Lancaster, Pennsylvania. MUS is in the business of creating and distributing curriculum materials in the field of mathematics for grades K through 12. MUS is subject to jurisdiction in Indiana by reason of its doing business in Indiana and its transaction of business within the state in connection with the claims raised in this complaint.

19.     Steve Demme is the founder and Chief Executive of MUS. He is a resident and citizen of Pennsylvania. He is subject to jurisdiction in Indiana by reason of frequent visits to Indiana to transact business in Indiana in connection with the claims raised in this Complaint.

20.     Ethan Demme is the son of Steve Demme and is Chief Operating Officer of MUS. He is a resident and citizen of Pennsylvania. Ethan Demme is subject to jurisdiction in Indiana by reason of his visits to Indiana in connection with the claims asserted in this Complaint, and by reason of his commission of tortious acts outside of Indiana that have created injury within Indiana, while he has transacted business in Indiana.

IV.    Facts

A.    **THE WRONGFUL TERMINATION CLAIMS OF PLAINTIFFS**

1. **Background: The Home Schooling Market**

21.    Home-schooling is the practice of educating children at home, under the supervision of parents instead of sending them to public or private school. Home schooling has grown dramatically over the last two decades. Studies show that in 1990, the number of home-schooled children was approximately 300,000 while in 2010 it was over two million. The market for curriculum materials suitable for home schooling has grown exponentially as a result of the growing number of home-schoolers.

22.    Conventional curriculum materials used in public or private schools are frequently inappropriate for home-schooling because they are designed for classroom teaching, not the home environment. Home-based curriculum materials can allow the student to progress at his or her own pace, with curriculum materials designed for the home.

2. **Steve Demme Starts Math-U-See**

23.    Steve Demme, a mathematics teacher, began MUS as a way of teaching mathematics to grade-schoolers using demonstrative aids such as colored "manipulatives" that are like plastic building blocks. He began to develop a curriculum around the manipulatives and sold this curriculum to Christian-based private schools and to those involved in home schooling.

3. **The Challenges of the Home-Schooling Market**

24.    In the early 1990's because the Internet was in its infancy and the home-schooling movement was small and disconnected, it was difficult for a publisher of curriculum materials to reach this market. Conventional bookstores typically did not carry home-schooling materials; there were relatively few distributors of such materials; mass advertising, such as national

television or magazines, and even direct-mail catalog sales, was beyond the reach of most publishers, and there was little in the way of centralized information or resources.

25.     At that time, then, the sale of MUS products to home-schooling parents was a painstaking, time-consuming and labor-intensive process.  Home schooling had recently become legal in many states, and home schoolers did not readily identify themselves to the public; rather, they knew each other and met in each others' homes.  In order to reach this market, it was necessary to be a part of this movement.  Further, there was no curriculum specifically for the home-school market; the notion of materials, such as Math-U-See, that were specifically designed for that market was novel.   There was no centralized or accessible source of information about home schooling or home schoolers that could serve as a springboard for marketing curriculum materials.

26.     Steve Demme did not have the connections to reach home-schoolers throughout the country, nor did he have a staff to seek out and reach home-schoolers.  He had no advertising budget, no public relations firm and no sales force.  Instead, he enlisted the support and resources of individuals, such as Plaintiffs, who themselves were already part of the movement in their communities and who had connections to those interested in home schooling.  These individuals, or "Reps," introduced the MUS curriculum to the persons they knew in the movement, and arranged for Steve Demme to speak at home-schooling events in order to promote the product. Customers bought Math-U-See on the basis of their personal relationships with and trust in the Reps.  In the early years, most of the sales were made by word-of-mouth.

27.     In some parts of the country, home-schooling conventions or fairs, held in local communities, were popular venues where people could learn and exchange information about home schooling.  These fairs frequently featured speakers and seminars as well as exhibitors who

sold curriculum materials.   Sellers of home-schooling curriculum materials generally had to personally sell the materials to parents, and counsel them on the use of the materials.  Over time, the number of venues  for such fairs increased.

### 4.  The Reps, or Distributors, Meet the Challenges and Build the Brand

28.    As individual distributors, or Reps, Plaintiffs bought MUS products at approximately a 50 percent discount off retail price and then had to resell the inventory to the public. Reps were required to purchase minimum volumes of these materials—typically several thousand dollars worth at a time—and then to take the risk of selling or not selling them.  Once MUS had sold the books to the distributors, it was done:  MUS had made its money; there was little provision for return of inventory.

29.    For the Reps, however, buying the books from MUS was simply the beginning of the work:  The Reps had to locate, travel to, and participate in curriculum fairs; create and advertise workshops in order to demonstrate the product, and convince parents of the merits of Math-U-See; confer with and counsel parents on how the Math-U-See line should be taught to their children;   carry a stocking inventory of all Math-U-See items for display and demonstration; establish and operate credit-card processing; ship the products to customers; provide customer service; answer questions; take returns of defective products; and otherwise manage the business in their territories.  At all times the Reps, as opposed to MUS, developed and maintained the relationship with the customers and bore the risk of bad credit, defective books or unsatisfied customers.  In the early days, Reps sometimes traveled hundreds of miles to attend a fair and spent days there at their own expense without making sufficient sales to cover their expenses.  Although Reps were entirely responsible for the purchaser-seller relationship

between themselves and their customers, Steve Demme and MUS dictated the terms of sale, including prices for products and shipping.

30. Despite these hardships, the Reps built a customer base for the MUS product, one family at a time. The work was difficult, but the Reps grew the market and Math-U-See became an award-winning math curriculum in the home-schooling market. The Reps developed business and personal relations with thousands of customers; frequently, the market for a family would continue over a number of years, as children aged and needed more advanced materials.

31. The Reps, including Plaintiffs, developed customer lists, containing the contact information for their customers, their purchase history and notes on any particular needs. With this list, it was possible to predict many of the purchases of the customers for several years out, as children grew older.

## 5. The Written Distribution Agreements

32. Beginning no later than 1996, Steve Demme formalized the relationship with the Reps in a written Distribution Agreement. The contracts were signed with each Rep, including Plaintiffs. Each contract stated that it "shall be for a period of one year" and was renewable "for each successive one year period as long as said distributor continues to perform according to the terms of this agreement." The contract was prepared by Steve Demme and required by him as a condition of continuing as a Rep.

33. In the 1990s, MUS and Steve Demme sent the Reps a new written agreement each year; it was always identical. A true copy of one of Sue Lynch's written agreements is annexed hereto as Exhibit 1. At some point Steve Demme stopped sending written agreements out. The parties nonetheless continued to perform, and the agreements were renewed each year. Steve Demme never sent the Reps a notice of termination or non-renewal prior to late 2010.

10

## 6. **Steve Demme Personally Embraces the "Rep Model"**

34.     Steve Demme embraced the "representative" or "distributor" model, and the use of Reps as independent distributors, from the beginning right up until he wrongfully terminated the agreements and relationships with the Reps. He vowed that MUS products were sold exclusively through Reps because Reps were best situated to provide the personalized counseling to customers and parents that MUS required.   He claimed that God had led him to the "Rep Model," and he sometimes referred to Reps as "math missionaries."

35.     From the mid-1990s to 2010 Steve Demme repeatedly and overtly demonstrated his commitment to the "Rep Model:"

- Early on, he told the distributors he had turned down other distribution opportunities (such as a national distributor or catalog sales) in favor of the "Reps;"

- In May, 2005, at a dinner with Sue Lynch and Carolyn Richardson, he said that he would never get rid of the Reps;

- In November, 2005, at a conference in Arkansas, the Angles and Lynch asked him about the future of the Rep Model, and he affirmed that it would continue as long as they did their jobs;

- In January 2007, he published to the Reps a letter that he had written to someone seeking to become a Rep. That letter praised the existing reps and stated that he would not be removing them;

- In March, 2007, in Indianapolis, Indiana, he told Jim Lynch that he was committed to the Rep Model;

- In 2007, as described below, he reassured the Angles that he was committed to the Rep Model after had moved to Idaho in light of concerns about Jim's health;

- In March, 2009, in South Bend, Indiana, at dinner with Sue Lynch and her husband, Jim Lynch, he said he was committed to the Rep Model and would not get rid of the Reps.

36.    His commitment to the Rep Model, and to distribution solely through Reps was further manifested in policy manuals, conference calls, letters and emails. Central to this message was the repeated conviction that, consistent with the contract, Reps would retain the Math-U-See line for as long as they did their jobs.

### 7. Steve Demme and Math-U-See's Fiduciary Duties

37.    From the beginning of the relationship between Math-U-See and its Reps, Steve Demme induced the Reps to put trust in him and be dependent upon him, in return for which he promised to take care of them by continuing to supply the Math-U-See product to them for distribution. On the one hand, Steve Demme imposed restrictions on its Reps that made them dependent upon MUS as their sole supplier, and subject to his whims and decisions. Reps were forbidden from carrying other lines of products, so they did not have the cushion of a diverse product line if one of them – such as MUS – should ever fail. MUS required Reps to make minimum purchases, and limited Reps' abilities to make returns. Reps were required to transport truckloads of books to fairs so that they could deliver the books into customers' hands, even though it would have been more efficient if the reps had simply displayed the books and taken orders that would be shipped later. But Steve Demme would not allow that.

38.    Steve Demme openly characterized the Rep Model as one given by God. The Angles and Sue Lynch were thus induced to believe that Steve Demme and MUS held their interests paramount, and would do nothing to injure those interests. Thus, even when Steve Demme first announced that he was ending the Rep Model, the Distributors believed that he was telling them that he was going to take care of their interests. The Angles and Lynch trusted in Steve Demme to provide for them in the future in the same manner that he had done so previously.

12

### 8. **Sue Lynch Develops Indiana and Illinois**

39.     In October of 1993, Sue Lynch attended a math workshop given by Steve Demme in Indiana for private Christian school teachers; she asked him whether his method would work for teaching one-on-one, and explained that she was a home-schooler.  He responded that the curriculum was designed for one-on-one teaching and that he himself was a home-schooler.  She arranged for him to present two workshops in her area in late 1993 and early 1994, and in 1994 she became the Rep for Indiana.  In 1996, she became the Rep for Illinois as well.

40.     As a Rep, Lynch purchased and carried an inventory of at least one each of Steve Demme's Math-U-See products, learned the curriculum herself, demonstrated the product at workshops and fairs, counseled parents on placement of their children within the Math-U-See curriculum, and sold, invoiced, and collected for the books. The entire risk of the enterprise was hers, and there were many occasions in the early years when she lost money on a workshop or presentation.

41.     As the Rep for Math-U-See products for the states of Indiana and Illinois, she built the market in Indiana and Illinois so that, by 2009, her gross sales had risen to hundreds of thousands of dollars.

42.     As described above, Lynch had a contract with Steve Demme and MUS that renewed and continued as long as she performed, and she had been induced to work in this business because of the contract and the representations that Steve Demme had made.  She was entitled to continue as a Rep for as long as she did the job, and is entitled to damages for the value of the lost distributorship as a result of Steve Demme's and MUS's wrongful termination, as described more fully below.

## 9. The Angles Develop Four States and Overseas Markets

43.    In the summer and fall of 1995, Lisa and Jim Angle were living in Montana and running a store called the Home Learning Center that sold products for home-schooling when Lisa heard about Math-U-See from a friend. She called Steve Demme to inquire about selling Math-U-See and he agreed to allow the Angles to sell it, together with other curriculum at the store. The Angles continued to sell in Montana and North Dakota from their store, and in or about 1995 or 1996, they signed the written distributorship agreements with Steve Demme and Math-U-See that were identical in form to the one signed by Lynch.

44.    As of 1998, the Angles were serving 1,200 people from their store when they heard that Tennessee had opened up as an MUS territory. They sought Steve Demme's permission to take over that territory together with a portion of Northern Alabama, and he agreed, provided that they move to Tennessee to service it. Placing all of their trust in Math-U-See and Steve Demme, largely because of his professed Christian faith, the Distribution Agreement and his promises that they would have Math-U-See line to sell as long as they performed, Jim and Lisa Angle, and their seven children (at the time), sold their home-school store in Montana, a maternity store they operated, and two residences, and moved to Tennessee in order to build up the Tennessee and Alabama markets for MUS.

45.    The Angles worked hard; the entire family pitched in, and they made a success of MUS in the new territory. In approximately 2002 they took over the rest of Alabama, and in 2003, Steve Demme awarded them Mississippi. Continuing their success, the Angles became a distributor of MUS products to select international markets in 2004 and distributor to the United States Military and U.S. Territories in 2006.

46. Like Lynch, the Angles put in great effort developing the market for Math-U-See, and passed up other opportunities. They bore the entire risk of the operation and financed the business themselves. The Angles have a total of 9 children today, many of whom were born during the Angles' time with Math-U-See and six of whom are still at home. By 2005, pursuant to the inducements of Steve Demme and MUS, the Angles were completely dependent upon MUS for their livelihood; Steve and Ethan Demme were well aware of that dependence.

47. At a convention of Reps in Arkansas in 2005, Steve Demme circulated a questionnaire to all of the Reps that asked them all about their businesses. The questionnaire prompted the Angles to confirm with Steve Demme that they would continue as Reps, as provided in the contract. Steve Demme told them that he was committed to the Rep Model and that they would continue to be able to sell Math-U-See in their territories for as long as they continued to do the job. He also said that it was possible for their children to work in the business so long as he approved it. This meeting reinforced the Angles' conviction to continue with MUS.

48. For Lisa, this assurance gave her confidence to invest substantial additional effort in curriculum development for MUS.

49. In 2007, because Jim Angle's health was declining, the Angles contemplated moving to Idaho. They asked Steve Demme if they could do so, and he consented, provided that they maintain a shipping center in Tennessee; they arranged for this, and continued to service the same markets that they had been servicing. Steve Demme told them that he continued to be committed to the Rep Model, and that they would continue to sell MUS products for as long as they did their jobs. He never told them, prior to 2010, that their contract was terminated or that they did not have a business.

15

50.     In July 2007, in reliance on Steve Demme's word, the Angles moved to Idaho.

## 10. The Defective Books

51.     Prior to 2009, MUS published its books in "comb" bindings, in which the pages were punched with holes that fit a round plastic comb that kept the pages together. In 2008, MUS announced that it was changing to a conventional hard-back binding, and that Reps should sell out their comb-bound books, which Plaintiffs did their best to accomplish. MUS, however, was late in getting the new hard-bound books ready, and many Reps were now left without sufficient inventory for customers. MUS first required Reps to purchase inventory from each other; later, he agreed to reprint a number of comb-bound books. Shortly thereafter, the hard-bound books were ready, which left MUS with an overstock of comb-bound books. Steve Demme asked Reps to return to him whatever comb-bound books they had, and that he would put them in a "clearance cart" on the MUS website, giving the public the impression that they were being sold at a discount. In fact, they were not; he sold them at the regular price. Meanwhile, Reps were left with their inventories of hard-bound books, which were more expensive. Thus, customers had an incentive to purchase the comb-bound books from MUS rather than the hard-bound versions of the same books from the Reps, simply to save money.

52.     As the Reps were complying with Steve Demme's request to return the comb-bound books, it was discovered that the new hard-bound books were riddled with errors. Customers were disappointed with the hard-bound books, the reputation of the Reps was injured, and there was mass confusion as Steve Demme tried to patch up the problem by sending coupons good for future purchases to customers with bad books. Both because the hard-bound books were more expensive and because they were riddled with errors, customers opted to purchase the comb-bound books directly from headquarters, eating into the sales of the Reps. Also,

purportedly to deal with this problem, MUS asked the Reps to send it customer information with respect to those who had received bad books. This was the first time that MUS had asked for Reps' customer information, and both the Angles and Lynch handed over the information without question.

53.    Steve Demme then aggravated the situation by reprinting, yet again, the comb-bound books. Thus, Steve Demme turned what he billed as a "clearance" sale to assist Reps in exhausting their old inventory into an opportunistic diversion of sales the Reps would have made to MUS.

### 11. The Termination

54.    In the Fall of 2009, with the assistance of Ethan Demme, Steve Demme held a conference call with all of the Reps to announce a major change in the way that MUS would do business. He told the Reps that MUS was going to gradually take over the shipping of all books in order to free the Reps up from the burden of carrying inventory and shipping books, so that they could develop new business and expand their markets. Specifically, Steve Demme said:

- Because of the Internet, people were not attending home school fairs as much and were purchasing product over the Internet instead.

- MUS would ship all orders from a central location.

- Reps would be paid a percentage of the sales that would match the profit they actually made on sales of books.

- Reps would be free to "reach out to new markets."

- Reps would still retain their territories and be paid on the basis of sales in their territories.

- Because Reps would be freed up to solicit new markets, they would "get the same percentage and make more money in the long run." "You're going to increase your sales, which will increase your profit."

- Confirming his fiduciary role and the assurances he had given the Reps for nearly two decades, Steve Demme said "Math-U-See would not be where it is today if we weren't all working together. This has not been Steve's company, it hasn't been the Reps company, it's been all of us together, working together . . .. And I think that God led us to this model and I'd like to maintain it as long as possible."

55.   In January 2010, Steve Demme flew in all the Reps to a hotel near company headquarters in Lancaster, Pennsylvania for an annual Reps conference. At that conference, Steve Demme announced, again, the plan to ship books from a central location, but instead of confirming that the Reps would get a percentage of sales and would have the opportunity to become more profitable, he made a series of vague statements: "We are moving towards centralizing the way we do business....we will also have one central database.... As of January 1, 2010, I do not owe you anything.... The speed of the transition from our current model to one where all are employees instead of independent contractors depends on technology...   I am exploring ways to provide some method of compensation for your years of faithful labors in your region...."  In fact, Steve Demme was announcing the end of the Rep Model and the termination of the Reps' distributorships, but he veiled it in references to people becoming "employees" and promises of "compensation." Most of the Reps in attendance did not understand that he was announcing the end of their distributorships. Instead, they thought, as he had promised earlier, that he was simply shifting the shipping responsibility and that they would retain their distributorships. Steve Demme confirmed these statements in an email on February 4, 2010.

56.   In April, 2010, however, Steve Demme announced that the Reps would be terminated by July 1, 2010, in order to ensure "PCI Compliance." "PCI Compliance" refers to requirements for credit card security. In fact, there was no issue about PCI compliance that mandated an end to the Rep Model or to distribution through independent Reps. Nonetheless, Steve Demme insisted that PCI Compliance required that the God-given Rep Model be ended,

even though overseas Reps continued to operate, and a domestic Rep continued to service special needs schools.

57.    On May 5, 2010, Steve Demme announced that the Rep Model would cease June 15, 2010, because of the need for PCI Compliance. He claimed that a "bonus structure," in which he would pay Reps "bonuses" would "relieve" the "economic stress" of losing their distributorships. At the same time, he asked the Representatives to transfer their customer lists and databases to headquarters.

58.    In reliance upon Steve Demme's promises of compensation, and upon the fiduciary duties he had undertaken, the Angles sent MUS their customer database. Sue Lynch did not do so.

59.    In June 2010, Steve Demme sent a Termination of Services Agreement to the Reps and gave them three days to respond. A true copy of this Agreement is annexed as Exhibit 2. The agreement formally ended the relationship between the Reps and Math-U-See, provided for a small payment over time, the basis for which was not explained, and required the Reps to sign a two-year non-competition agreement effectively barring them from doing the only type of work they had been doing for more than a decade. During this time, MUS was downloading the databases, including the customer information, of the Reps.

60.    As the Termination of Services Agreement was circulating, Ethan Demme told Lisa Angle that it was a standard agreement and that all it did was clarify the relationship between her and MUS. None of the Plaintiffs, however, executed this agreement. On June 10, 2010, MUS announced that the 888 number would no longer forward to distributors as of the 15th. Steve Demme also instructed the distributors to put an outgoing message on their own

phone numbers directing people to call the central number. He disabled distributors' email and announced that MUS would process all orders.

61. Ethan Demme knew of, participated in, and assisted his father Steven in planning and executing the termination of the Reps, including the making of false and misleading statements to the Reps to either lull them into inaction or to mislead them into believing that PCI compliance required their demise.

62. On July 22, 2010, MUS and Steve Demme sent Sue Lynch a Notice of Non-Renewal of her Distributor Agreement, a true copy of which is annexed as Exhibit 3. The Angles continued after that date to attempt to resolve their differences with Defendants, but were unable to do so.

## 12. The Injuries Sustained by Plaintiffs

63. At the time they were terminated, both Sue Lynch and the Angles had well-established businesses that were generating sales in the hundreds of thousands of dollars. At the time they were terminated, Lynch on the one hand and the Angles on the other had every expectation to continue as Math-U-See Reps for the foreseeable future and to maintain the same level of income, at the least, that they had at the time that they were terminated. Thus, as a result of Defendants' bad-faith termination of them, the Plaintiffs lost the values of their businesses, estimated to be several hundreds of thousands of dollars for each.

## B. THE COPYRIGHT CLAIMS OF LISA ANGLE

64. Lisa Angle brings claims for copyright infringement arising from her authorship of six groups of works: The "Calculus Works;" the "Recorded Calculus Lessons;" the "Honors Books;" the "Pre-Calculus Works," "Algebra 2 and Quiz Works," and "Test Booklets." Collectively, they will be referred to as her "Works." Angle created her Works in reliance on

the confidential, fiduciary relationship that Steve Demme had developed with her, and upon his agreement that she and her family would always have a future as a distributor of MUS products, so long as they were distributing the product competently.  Lisa Angle believed what Steve Demme had said – that Math-U-See was not one company, but was both the company and the distributors working together and interdependent.  In this belief, she turned her considerable knowledge and talents to writing curriculum materials, unaware that MUS and Steve Demme would falsely claim all rights in them and give her nothing.

1. **The Calculus Works**

65.     Based upon Steven Demme's repeated undertakings and promises that Angle would be able to continue to sell MUS products for as long as she performed the agreement, and based upon the trust and confidence he engendered, Lisa Angle ("Angle") agreed, as an independent contractor, to write a calculus textbook (the "calculus textbook"), and the corresponding teacher's text (the "calculus teacher's text") and tests (the "calculus tests") (collectively, the "Calculus Works") in December 2007 for Defendants MUS and Steve Demme, and agreed to be paid $20 to $30 an hour at that time.  From late 2007 through July 2010, Angle wrote the Calculus Works by hand or typewriting and faxed that manuscript, in sections, to MUS so that its typist could prepare Angle's work for publication.

66.     Angle then reviewed, revised and corrected the typed versions and returned them to MUS.  This process continued until Angle completed the Calculus Works in July 2010.

67.     In late May 2010, as she was completing the Calculus Works, but after Steve Demme had announced the termination of the distributor agreements, Steve Demme asked Angle to sign a work-for-hire agreement in which she would agree that all of the work she had done on the Calculus and Honors Works belonged to Math-U-See.  She did not sign that agreement.

68.    In July 2010, after he had cut off her distributorship, and therefore her livelihood, Steve Demme sent Angle a termination of services agreement that contained a two-year non-compete clause. He also sent a contract for employment at severely reduced wages compared to her previous earnings as a distributor. She was also expected to sign the work-for-hire agreement that had been sent to her in May.   Angle did not sign these agreements.

69.    In August, 2010, as the relationship deteriorated, Angle asked Steve Demme whether she could share in the benefits of the sales of the Calculus Works – i.e., whether she would receive a royalty on sales. Steve Demme told Angle that MUS owned the works and that she would not receive anything for them.

70.    In August 2010, Angle received copies of the Calculus Works that MUS was then copying, distributing, and selling. They were virtually identical to the Calculus Works that Angle authored.

71.    In September 2010, Steve Demme and Angle renegotiated the terms of the termination and work-for-hire documents so that the work-for-hire document covered all work that Angle had done for MUS and the non-compete was shortened to one year; Angle did not sign any of these agreements.

72.    In the published Calculus Works, Steve Demme falsely claimed copyright in the Calculus Works for himself. Specifically, the copyright notice in the Calculus Works states that they are copyrighted "by Steven Demme." Steve Demme, however, had no claim of right to copyright: he was not the author; did not employ Lisa Angle to prepare the Calculus Works; did not obtain a work-for-hire agreement from her; and did not obtain an assignment of any copyright in Calculus Works.

73.    The calculus textbook does not list an author, the calculus tests do not list an author, and the calculus teacher's text lists Steve Demme as the author and Angle as a co-author. Angle, however, was the sole author of all of the Calculus Works (aside from drawings that another individual added to the Calculus Works).

74.    Since August 2010, MUS and Steve Demme have been copying, distributing, and selling the Calculus Works, or derivative works, throughout the world, and have licensed or may license others to copy them in foreign countries, without the consent of Lisa Angle.

75.    Angle is the author and owns the exclusive rights to the Calculus Works and the exclusive rights to prepare works derivative of any of the Calculus Works.

76.    Upon information and belief, at all times pertinent hereto, MUS and Steve Demme knew that Angle was the author and owner of the copyrights in the Calculus Works and that neither Steve Demme nor MUS owned the copyrights to the Calculus Works.

77.    On May 9, 2011, Angle submitted to the Register of Copyrights a completed application for registration, deposit copies, and the applicable fee in order to register the copyright to the calculus textbook, the calculus teacher's text, and the calculus tests.

## 2. Recorded Calculus Lessons

78.    Also based upon Steve Demme's representations as set forth above, Angle agreed as an independent contractor with Steve Demme and MUS to record video lessons for the Calculus Works in June, 2008 (the "Recorded Calculus Lessons"). MUS and Steve Demme paid her $20 to $30 an hour for her work.

79.    Angle recorded herself on tape teaching chapters 1 through 28 of the 30 chapters for the Calculus Works.   In these tapes, Angle explained the math problems found in the teacher's text.

80.   Angle completed the Recorded Calculus Lessons in March 2010.

81.   Angle sent the tapes of the Recorded Calculus Lessons to MUS and Steve Demme on various dates between June 2008 and March 2010.  Steve Demme then recorded himself using the tapes that Angle produced as a model on which to base his instructional DVDs.

82.   Angle then edited Steve Demme's instructional DVDs on many dates between September 2008 and March 2010.

83.   Upon information and belief, at all times pertinent hereto, MUS and Steve Demme knew that Angle was the author of and the owner of the rights to the Recorded Calculus Lessons.

84.   Upon information and belief, MUS and Steve Demme knew that neither MUS nor Steve Demme owned the rights in the Recorded Calculus Lessons.

85.   MUS and Steve Demme reproduced, copied, and distributed for sale throughout the world, and have licensed or may license others to copy in foreign countries, recordings of lessons virtually identical to Angle's Recorded Calculus Lessons or to the Calculus teacher's manual, referred to above, without Angle's authorization.  The recordings of lessons sold by MUS and Steve Demme utilize a significant amount of Angle's protected expression from the Recorded Calculus Lessons or teacher's manual.

86.   Upon information and belief, MUS and Steve Demme has falsely claimed copyright in the recordings of lessons that are virtually identical to Angle's Recorded Calculus Lessons.

87.   On May 9, 2011, Angle submitted to the Register of Copyrights a completed application for registration, deposit copies, and the applicable fee in order to register the copyright to the Recorded Calculus Lessons.

### 3. **Honors Books**

88.     Also based upon Steve Demme's representations, as set forth above, Angle agreed with MUS and Steve Demme, as an independent contractor, to co-author four sets of advanced materials (the "Honors Books").  MUS and Steve Demme paid her $20 an hour for her work.

89.     Angle co-authored the Honors Books with Miriam Homer ("Homer").   The Honors Books were prepared for Pre-Algebra, Algebra 1, Algebra 2, and Pre-Calculus.  Angle and Homer began authoring the Honors Books in the Fall of 2004.  With the exception of Pre-Calculus, Homer and Angle completed the Honors Books in 2005.  Homer and Angle completed the Pre-Calculus book in 2006.

90.     Angle sent her manuscript contributions to the Honors Books to MUS and Steve Demme at various times throughout 2004 and 2005.

91.     Beginning in 2005, Steve Demme copied, distributed and sold the Honors Books. In May, 2010, Steve Demme registered the copyrights for the Honors Books with the Copyright Office in his own name, claiming falsely that he owned the rights in the Pre-Algebra, Algebra 2, and Pre-Calculus books pursuant to a "written agreement."   There was, however, no written agreement pursuant to which Angle had transferred any rights in the Honors Books to Steve Demme. Steve Demme also registered with the Copyright Office the copyright in the Algebra 1 Honors Book by falsely claiming that he authored this book.

92.     Steve Demme has falsely claimed copyright in all of the Honors Books and Steve Demme has falsely claimed authorship of the Algebra 1 Honors Book.

93.     Angle has not transferred her ownership interest in the Honors Books to Steve Demme.

94.    Upon information and belief, at all times pertinent hereto, MUS and Steve Demme knew that Angle was a co-owner of the copyright rights in the Honors Books.

95.    Upon information and belief, MUS and Steve Demme knew that neither MUS nor Steve Demme owned the copyrights in the Honors Books.

96.    Upon information and belief, MUS and Steve Demme knew that Steve Demme did not author the Algebra 1 Honors Book.

97.    MUS and Steve Demme are copying, distributing, and selling Honors Books virtually identical to the Honors Books created by Angle and Homer throughout the world or have licensed persons overseas to copy and distribute such books, without Angle's consent or authorization.   In all instances, portions of the Honors Books have been incorporated into other works that MUS and Steve Demme are copying.

98.    On May 9, 2011, Angle submitted to the Register of Copyrights completed applications for registration, deposit copies, and the applicable fees in order to register the copyrights to the Honors Books.

### 4.    Pre-Calculus Works

99.    Also based upon Steve Demme's representations, as set forth above, Angle agreed with MUS and Steve Demme, as an independent contractor, to contribute 7 chapters and related content to a set of curriculum materials for Pre-Calculus, consisting of a student text and honors materials, a teacher's manual with answers to exercises, test booklets and lessons recorded on DVDs or videotape referring to the 7 chapters (the "Pre-Calculus Works").   Angle's work was to be incorporated with the work of other authors so that the Pre-Calculus Works, when completed, were joint works.   MUS and Steve Demme paid her $20 an hour for her work.   She began authoring her contribution to the joint work in the Fall of 2004.   To the best of Angle's

recollection, she never signed a work for hire agreement or license giving Steve Demme rights in the Pre-Calculus Works.

100.   Between the fall of 2004 and continuing through the winter of 2005, Angle completed various portions of chapters 19-22 and 28-30 of the Pre-Calculus Works.

101.   Angle sent the chapters that she authored to MUS and Steve Demme on February 1, 2005.

102.   Steve Demme falsely registered the copyrights in the Pre-Calculus Works with the Copyright Office under his own name.  Specifically, Steve Demme falsely claimed that he was the author of the entire Pre-Calculus Works.

103.   Upon information and belief, at all times pertinent hereto, MUS and Steve Demme knew that Angle was an author of the Pre-Calculus Works and was co-owner of the copyrights in the Pre-Calculus Works.

104.   MUS and Steve Demme are copying, distributing, and selling throughout the world, and have licensed or may license other persons overseas to copy, the Pre-Calculus Works with chapters and DVDs virtually identical to those that Angle authored and without Angle's authorization.

105.   On May 15, 2011, Angle submitted to the Register of Copyrights a completed application for registration, deposit copies, and the applicable fee in order to register the copyright for her contribution to the Pre-Calculus Works.

5.   **The Algebra 2 and Quiz Works**

106.   Also based upon Steve Demme's representations, as set forth above, Angle agreed with MUS and Steve Demme, as an independent contractor, to prepare lesson 31 of the Student Text, instruction manual and DVDs for Algebra 2 and a set of quizzes for various high school

27

mathematics subjects ("The Algebra 2 and Quiz Works"). The Algebra 2 work was to be incorporated with the work of other authors. Between November 1, 2004 and continuing until December 30, 2004 Angle completed various portions of the Algebra 2 work, and in the summer of 2010 completed the Quiz Works. To the best of Angle's recollection, she never signed a work for hire agreement or license giving Steve Demme rights in the Algebra 2, lesson 31 material. The Quiz Works, however, were entirely the work of Angle, who was and is the sole author of those works.

107. Angle sent the Algebra 2 materials to MUS and Steve Demme in or about 2004 and the high school math quizzes in 2010.

108. Upon information and belief, at all times pertinent hereto, MUS and Steve Demme knew that Angle was the author of the Algebra 2 and Quiz Works and owned the copyrights in them.

109. MUS and Steve Demme are copying, distributing and selling throughout the world, and have licensed or may license other persons overseas to copy the Algebra 2 and Quiz Works, all without Angle's authorization.

110. On May 15, 2011, Angle submitted to the Register of Copyrights a completed application for registration, deposit copies and the applicable fee in order to register the copyright for her contributions to Algebra 2 and Quiz Works.

### 6.   The Test Booklets

111. Based upon Steve Demme's representations, as set forth above, Angle agreed with MUS and Steve Demme, as an independent contractor, to prepare test booklets for Pre-Algebra, Algebra 1 and Geometry (the "Test Booklets") . To the best of Angle's recollection,

she never signed a work for hire agreement or license giving Steve Demme rights in the Test Booklets. Angle was and is a joint author with Steve Steve Demme of these works.

112.   Angle sent the Test Booklets to Steve Demme and MUS in 2002.

113.   Upon information and belief, at all times pertinent hereto, MUS and Steve Demme knew that Angle was an author of the Test Booklets.

114.   MUS and Steve Demme are copying, distributing and selling throughout the world, and have licensed or may license other persons overseas to copy the Test Booklets.

115.   On May 15, 2011, Angle submitted to the Register of Copyrights a completed application for registration, deposit copies and the applicable fee in order to register the copyright for her contributions to the Test Booklets.

## COUNT I

### (Lynch and Math-U-See Indiana, Inc. v. Steve Demme and MUS -- Breach of Contract)

116.   Plaintiffs repeat and reallege all of the allegations set forth in the preceding paragraphs as though fully set forth herein.

117.   Sue Lynch and Math-U-See Indiana, Inc. on the one hand, and Steve Demme and MUS on the other, had a contract pursuant to which Lynch and Math-U-See Indiana would continue as Math-U-See distributors in their respective territories for so long as they performed the tasks of soliciting and filling orders for MUS products. The contract was a one-year contract that was renewable every year and that continued so long as those Plaintiffs performed in accordance with the contract.

118.   Lynch and Math-U-See Indiana have performed in accordance with the contract.

119.   Defendants Steve Demme and MUS have breached the agreement by terminating the contract.

120.   As a result of the termination of their distributorship agreements by Math-U-See and Demme, Lynch and Math-U-See Indiana have suffered damages in an amount consisting of the value of their distributorships, which they are entitled to recover at trial.

## COUNT II

### (Lisa and Jim Angle v. MUS and Steve Demme -- Breach of Contract)

121.   Plaintiffs repeat and reallege all of the allegations set forth in the preceding paragraphs as though fully set forth herein.

122.   Lisa and Jim Angle, on the one hand, and Steve Demme and MUS on the other, had a contract pursuant to which the Angles would continue as Math-U-See distributors in their respective territories for so long as they performed the tasks of soliciting and filling orders for MUS products.  The contract was a one-year contract that was renewable every year and that continued so long as those Plaintiffs performed in accordance with the contract.

123.   The Angles have performed in accordance with the contract.

124.   Defendants Steve Demme and MUS have breached the agreement by terminating the contract.

125.   As a result of the termination of their distributorship agreements by Math-U-See and Demme, the Angles have suffered damages in an amount consisting of the value of their distributorships, which they are entitled to recover at trial.

## COUNT III

### (All Plaintiffs v. All Defendants – Breach of Good Faith)

126.   Under Pennsylvania law, a franchisor may not terminate a franchisee in bad faith.

127.   Plaintiffs had a franchise relationship with MUS and Steve and Ethan Demme in that the relationship was interdependent, and the franchisees were dependent upon the franchisor

for their continued existence. The Plaintiffs were trapped in a franchise in which they could not sell or service other lines and were completely dependent upon MUS and the Demmes.

128. The Demmes and MUS terminated the franchise agreement in bad faith by, among other things, first promising that they would retain their businesses and the profits from the distributorships; then taking their distributorships and falsely claiming that PCI compliance was the reason for the termination; falsely claiming that there was no contract between the parties; wrongfully taking the franchisees' customer lists; and cutting off the franchisee's access to their customers through email, telephone and the Internet.

129. As a result of Defendants' bad faith termination of their franchises, Plaintiffs have lost the value of their businesses, which they are entitled to recover at trial.

## COUNT IV

### (All Plaintiffs v. All Defendants - Breach of Fiduciary Duty)

130. Plaintiffs repeat and reallege all of the allegations set forth in the preceding paragraphs as though fully set forth herein.

131. MUS, Steve Demme and Ethan Demme induced the Plaintiffs to enter into a fiduciary relationship in which they placed their trust, confidence and dependence in the Demmes and MUS, as a result of MUS's and the Demme's repeated promises that they would take care of the Plaintiffs and that Plaintiffs would be able to continue to sell the MUS product. Thus, the Demmes and MUS induced the Plaintiffs to enter into a fiduciary relationship with them.

132. The Demmes and MUS breached their fiduciary duty to the Plaintiffs by terminating their distributorship agreements and further breached their fiduciary duty to Lisa Angle by wrongly taking her intellectual property.

133.    Plaintiffs have been damaged in an amount that is no less than the value of their lost distributorships, and in the case of Lisa Angle, the value of a reasonable royalty upon the products that she has written and that have been sold or will be sold in the future.

134.    Plaintiffs are entitled to recover their actual damages plus such punitive damages as the Court deems just and proper.

## COUNT V

### (Lynch and MUS-Indiana v. MUS and Steve Demme-Violation of the Indiana Franchise Act)

135.    Plaintiffs repeat and reallege all of the allegations set forth in the preceding paragraphs as though fully set forth herein.

136.    The relationship between Sue Lynch and MUS-Indiana on the one hand and MUS and Steve Demme on the other, was the relationship between a franchisee and a franchisor as those terms are defined under the Indiana Franchise Act.

137.    The distributorship between Lynch and MUS-Indiana on the one hand and MUS and Steve Demme on the other was a franchise as that term is defined in the Act.

138.    Under the Indiana Franchise Act, a franchisor may not terminate or refuse to renew a franchise relationship unless the franchisor has good cause and gives the franchisee reasonable notice and an opportunity to cure.

139.    MUS's and Demme's termination of the franchise violated the Indiana Franchise Act.

140.    As a result of the termination of the franchise, Lynch is entitled to recover the value of her business that was lost in Indiana as a result of Demme's conduct, plus costs and reasonable attorneys' fees.

## COUNT VI

### (Lynch and MUS-Indiana v. MUS and Steve Demme—Violation of Illinois Franchise Act)

141.   Plaintiffs repeat and reallege all of the allegations set forth in the preceding paragraphs as though fully set forth herein.

142.   The relationship between Sue Lynch and MUS-Indiana on the one hand and MUS and Steve Demme, on the other was a relationship between a franchisee and a franchisor as those terms are defined under the Illinois Franchise Act.

143.   The distributorship between Lynch and MUS-Indiana on the one hand and MUS and Steve Demme on the other was a franchise as that term is defined in the Act.

144.   Under the Illinois Franchise Act, a franchisor may not terminate or refuse to renew a franchise relationship unless the franchisor has good cause and gives the franchisee reasonable notice and an opportunity to cure.

145.   MUS's and Demme's termination violated the Illinois Franchise Act.

146.   As a result of the termination of the franchise, Lynch is entitled to recover the value of her business that was lost in Illinois as a result of Demme's conduct, costs and attorneys' fees.

## COUNT VII

### (Angles v. MUS and Steve and Ethan Demme–Violation of the Idaho Unfair Trade Practices Act)

147.   Plaintiffs repeat and reallege all of the allegations set forth in the preceding paragraphs as though fully set forth herein.

148.   Steve and Ethan Demme and MUS have violated the Idaho Unfair Trade Practice Act by, among other things, engaging in the following:

a. Selling franchises to the Angles without making the disclosures required under 16 C.F.R. Part 435 as incorporated into the Idaho Unfair Trade Practices Act;

b. Falsely representing to Reps in 2009 that MUS was going to take over shipping only so that Reps would be free to explore new markets when, in fact, they intended to take over their businesses.

c. Falsely representing to Reps that the reason for terminating them was PCI compliance;

d. Wrongfully demanding and taking the Angles' customer lists and database;

e. Promising Reps continuing compensation when, in fact, there was no intent to compensate them fairly;

f. Wrongfully terminating the Reps' distributorships;

g. Wrongfully requiring Reps to return the defective comb-bound books and then unfairly competing with them in the sale of those books;

h. Wrongfully and unlawfully copying and profiting from Lisa Angle's intellectual property, as described above;

i. Falsely inducing the Plaintiffs to rely upon Demme and MUS as a fiduciary.

149. As a result of Defendants' breaches of the Idaho Unfair Trade Practices Act, Plaintiffs have been injured in an amount to be determined at trial but not less than the value of their businesses. Plaintiffs are entitled to multiple damages in the discretion of the Court.

## COUNT VIII

### (Lynch and MUS Indiana v. MUS and Steve and Ethan Demme—Violation of Illinois Unfair Trade Practices Act)

150. Plaintiffs repeat and reallege all of the allegations set forth in the preceding paragraphs as though fully set forth herein.

151. Steve and Ethan Demme and MUS have violated the Illinois Unfair Trade Practice Act by, among other things, engaging in the following:

a.    Selling franchises to Lynch without making the disclosures required under 16 C.F.R. Part 435 as incorporated into the Illinois Unfair Trade Practices Act;

b.    Falsely representing to Reps that the reason for terminating them was PCI compliance;

c.    Falsely representing to Reps in 2009 that MUS was going to take over shipping only so that Reps would be free to explore new markets when, in fact, MUS and Demme intended to take over their businesses.

d.    Demanding that Reps turn over their customer lists to MUS when in fact, it had no right to request them;

e.    Promising Reps continuing compensation when, in fact, there was no intent to compensate them fairly;

f.    Wrongfully terminating the Reps' distributorships;

g.    Wrongfully requiring Reps to return the defective comb-bound books and then unfairly competing with them in the sale of those books;

h.    Falsely inducing the Plaintiffs to rely upon Demme and MUS as a fiduciary.

152.    As a result of Defendants' breaches of the Illinois Unfair Trade Practices Act, Lynch has been injured in an amount to be determined at trial but not less than the value of their businesses. Plaintiffs are entitled to multiple damages in the discretion of this Court.

## COUNT IX

### (Angles v. MUS and Steve and Ethan Demme—Violation of Tennessee Unfair Trade Practices Act)

153.    Plaintiffs repeat and reallege all of the allegations set forth in the preceding paragraphs as though fully set forth herein.

154.    Steve and Ethan Demme and MUS have violated the Tennessee Unfair Trade Practice Act by, among other things, engaging in the following:

35

a.   Selling franchises to the Angles without making the disclosures required under 16 C.F.R. Part 435 as incorporated into the Tennessee Unfair Trade Practices Act;

b.   Falsely representing to Reps that the reason for terminating them was PCI compliance;

c.   Falsely representing to Reps in 2009 that MUS was going to take over shipping only so that Reps would be free to explore new markets when, in fact, MUS and Demme intended to take over their businesses;

d.   Wrongfully demanding and taking the Angles' customer lists and database;

e.   Promising Reps continuing compensation win, in fact, there was no intent to compensate them fairly;

f.   Wrongfully terminating the Reps' distributorships;

g.   Wrongfully requiring Reps to return the defective comb-bound books and then unfairly competing with them in the sale of books;

h.   Wrongfully and unlawfully copying and profiting from Lisa Angle's intellectual property, as described above;

i.   Falsely inducing the Plaintiffs to rely upon Demme and MUS as a fiduciary.

155.   As a result of Defendants' breaches of the Tennessee Unfair Trade Practices Act, Plaintiffs have been injured in an amount to be determined at trial but not less than the value of their businesses.

## COUNT X

### (Angles v. MUS and Steve Demme—Violation of Law 75 of Puerto Rico)

156.   Plaintiffs repeat and reallege all of the allegations set forth in the preceding paragraphs as though fully set forth herein.

157.   The arrangement between the Angles on the one hand and MUS and Demme on the other was a dealer's contract as that term is used in the Puerto Rico Dealer's Act of 1964, commonly known as "Law 75."

158.   Under Law 75, a supplier may not directly or indirectly perform any act detrimental to the relationship between the supplier and the dealer or refuse to renew that contract except for just cause.

159.   Demme and MUS have violated Law 75 by terminating the Angles' distributorship in Puerto Rico without cause, by wrongfully taking the Puerto Rico portion of their customer list, by breaching their fiduciary duty and by executing the termination in a way that was detrimental and harmful to the Angles.

160.   The Angles are entitled to recover the value of their distributorship and damages sustained under Law 75 of Puerto Rico.

## COUNT XI

### (All Plaintiffs v. All Defendants—Tortious Interference with Contract)

161.   Plaintiffs repeat and reallege all of the allegations set forth in the preceding paragraphs as though fully set forth herein.

162.   The Plaintiffs had existing agreements with their customers to supply them with curriculum materials on an on-going basis so that they would be able to continue to educate their children.

163.   The Defendants knew of these ongoing contracts at all times relevant.

164.   The Defendants wrongfully and tortiously interfered with the Plaintiff's relationships with their customers by terminating their agreements and taking the Angles' customer lists, and by otherwise cutting off the Plaintiff's contacts with their customers.

37

165.   Plaintiffs have been damaged in an amount to be determined at trial but equal to the value of their ongoing contracts with their customers.

166.   Plaintiffs are entitled to recover their actual damages as well as punitive damages as a result of Defendant's wrongful conduct.

## COUNT XII

### (All Plaintiffs v. All Defendants—Tortious Interference with Prospective Business Relations)

167.   Plaintiffs repeat and reallege all of the allegations set forth in the preceding paragraphs as though fully set forth herein.

168.   Plaintiffs had valuable prospective business relations with existing and prospective customers within their territories for the sale of MUS products to them.

169.   The Defendants knew of these existing prospective business relations. Defendants undertook to tortiously interfere with and to take those prospective business relations from Plaintiffs without compensation.  Defendants did so in a malicious and harmful manner that included, among other things, deceptive conduct and abuse of a fiduciary relationship.

170.   Plaintiffs are entitled to recover the value of their lost prospective business relations.

## COUNT XIII

### (Angles v. All Defendants—Wrongful Conversion of Customer List)

171.   Plaintiffs repeat and reallege all of the allegations set forth in the preceding paragraphs as though fully set forth herein.

172.   The Angles had a customer list consisting of the contact information for their customers as well as their purchase history and any special needs that they had.  This customer list had been built up over nearly 20 years and was of substantial value in selling the MUS

38

curriculum. It also had value apart from the MUS curriculum because it could be used to sell home schooling materials to those persons.

173. Defendants wrongfully took the Angles' customer list.

174. The Angles are entitled to recover the value of their customer list and to enjoin Defendants from copying, using or disclosing it further.

## COUNT XIV

### (All Plaintiffs v. All Defendants—Promissory Estoppel—Distribution Arrangements)

175. Plaintiffs repeat and reallege all of the allegations set forth in the preceding paragraphs as though fully set forth herein.

176. Based upon the representations of Steve Demme, Ethan Demme and Math-U-See, the Plaintiffs, they invested in and remained Math-U-See distributors and gave up other opportunities.

177. As a result of their reliance upon Demme and Math-U-See's promises that they would continue to be distributors for as long as they did the job, they remained in that position.

178. Demme and Math-U-See have wrongfully terminated the distributorships in violation of the promises that they had made.

179. The Plaintiffs are entitled to recover the amounts that they have lost as a result of their reliance upon Defendants' promises.

## COUNT XV

### (All Plaintiffs - Unjust Enrichment/Quantum Meruit—Distribution Arrangements)

180. Plaintiffs repeat and reallege all of the allegations set forth in the preceding paragraphs as though fully set forth herein.

181.   The Plaintiffs have rendered services to the Defendants which have enriched the Defendants.

182.   The value of the Plaintiffs' services have been the value of the distribution network that the Plaintiffs have built up on behalf of the Defendants.

183.   As a result of the Defendants' wrongful termination of the Plaintiffs' distributorships, they lost the value of those businesses.

## COUNT XVI

### (Copyright Infringement – Calculus Works)

184.   Angle repeats and realleges the above paragraphs as though set forth fully herein.

185.   Angle is the author of the Calculus Works.

186.   Angle has, and had at all relevant times, the exclusive ownership of all United States rights, title, and interest in the Calculus Works.

187.   The Calculus Works contain material wholly original to their author and are copyrightable subject matter under the Constitution and laws of the United States.

188.   MUS and Demme's conduct violate Angle's rights under 17 U.S.C. § 106.

189.   MUS and Demme's willful and deliberate infringing acts have caused and continue to cause irreparable harm and damage to Angle and have damaged Angle in an amount not yet fully ascertained.

## COUNT XVII

### (Copyright Infringement – Recorded Calculus Lessons)

190.   Angle repeats and realleges the above paragraphs as though set forth fully herein.

191.   Angle is the creator of Recorded Calculus Lessons.

40

192.    Angle has, and had at all relevant times, the exclusive ownership of all United States rights, title, and interest in the Recorded Calculus Lessons.

193.    The Recorded Calculus Lessons contain material wholly original to its author and are copyrightable subject matter under the Constitution and laws of the United States.

194.    MUS and Demme's conduct violate Angle's rights under 17 U.S.C. § 106.

195.    MUS and Demme's willful and deliberate infringing acts have caused and continue to cause irreparable harm and damage to Angle and have damaged Angle in an amount not yet fully ascertained.

## COUNT XIII

### (Copyright Infringement – Honors Books)

196.    Angle realleges the above paragraphs as though set forth fully herein.

197.    Angle is a co-author of the Honors Books, giving her joint copyright rights with Homer.

198.    Angle has, and had at all relevant times, joint ownership of all United States rights, title, and interest in the Honors Books.

199.    The Honors Books contain material wholly original to its authors and are copyrightable subject matter under the Constitution and laws of the United States.

200.    MUS and Demme's conduct violate Angle's rights under 17 U.S.C. § 106.

201.    MUS and Demme's willful and deliberate infringing acts have caused and continue to cause irreparable harm and damage to Angle and have damaged Angle in an amount not yet fully ascertained.

## COUNT XIX

### (Copyright Infringement – Pre-Calculus Works)

202.   Angle realleges the above paragraphs as though set forth fully herein.

203.   Angle has, and had at all relevant times, joint ownership of all United States rights, title, and interest in the Pre-Calculus Works.

204.   Angle's contribution to the Pre-Calculus Works contains material wholly original to its author and is copyrightable subject matter under the Constitution and laws of the United States.

205.   MUS and Demme's conduct violate Angle's rights under 17 U.S.C. § 106.

206.   MUS and Demme's willful and deliberate infringing acts have caused and continue to cause irreparable harm and damage to Angle and have damaged Angle in an amount not yet fully ascertained.

## COUNT XX

### (Copyright Infringement—Algebra 2 and Quiz Works)

207.   Plaintiffs repeat and reallege all of the allegations set forth in the preceding paragraphs as though fully set forth herein.

208.   Angle has, and has had at all relevant times, ownership in the Algebra 2 and Quiz Works.

209.   Angles' Algebra 2 and Quiz Works are wholly original to its author and are copyrightable subject matter under the constitution and laws of the United States.

210.   MUS and Demme's conduct violate Angles' rights under 17 U.S.C. § 106. MUS and Demme's willful and deliberate infringing acts have caused and continue to cause

42

irreparable harm and damage to Angle and damaged Angle in an amount not yet fully ascertained.

## COUNT XXI

### (Copyright Infringement—Test Booklets)

211.    Plaintiffs repeat and reallege all of the allegations set forth in the preceding paragraphs as though fully set forth herein.

212.    Angle has, and has had at all relevant times, joint ownership of all United States right, title and intent in the Test Booklets.

213.    Angles' Test Booklets are wholly original to its authors and are copyrightable subject matter under the constitution and laws of the United States.

214.    MUS and Demme's conduct violate Angles' rights under 17 U.S.C. § 106.  MUS and Demme's willful and deliberate infringing acts have caused and continue to cause irreparable harm and damage to Angle and damaged Angle in an amount not yet fully ascertained.

## COUNT XXII

### (Accounting)

215.    Angle realleges the above paragraphs as though set forth fully herein.

216.    To the extent that Defendants, or any one of them, allege that they are co-authors of the Calculus Works, the Recorded Calculus Lessons, the Honors Books, the Pre-Calculus Works, the Algebra 2 and Quiz Works, and the Test Booklets, such Defendants are obligated to account to Angle for all exploitations thereof purportedly authorized by Defendants or any one of them.

43

217.   The amounts due to Angle can only be determined by an accounting, and consequently, an accounting is necessary and proper.

218.   To the extent any of the Defendants are co-authors, Angle has no adequate remedy at law and a balance of equities favors Angle.

219.   Accordingly, Defendants should be compelled to account to Angle.

## COUNT XXIII

### (Angle – Quantum Meruit)

220.   Angle realleges the above paragraphs as though set forth fully herein.

221.   Angle authored the Works in good faith as an independent contractor.

222.   MUS and Demme accepted Angle's services and have sold the works that she authored for their own profit.

223.   Angle expected to be compensated for her work beyond the $20 per hour that she received.  She reasonably expected that she would continue to benefit from her work by being able to continue operating as an MUS distributor.  Because defendants have made it impossible for her to continue selling MUS products, Angle is entitled to recover the reasonable value of the services she rendered to MUS and Demme.

224.   Angle is therefore entitled to the reasonable value of her services in creating the Works.

## COUNT XXIV

### (Angle – Unjust Enrichment)

225.   Angle repeats and realleges all of the foregoing allegations as though set forth here in full.

226.   Angle conferred a benefit on Defendants MUS and Demme by authoring works that Defendants were able to reproduce, copy, distribute, and sell.

227.   MUS and Demme have appreciated that benefit and profited off of that benefit, and have done so wrongfully:  by deception of the distributors (specifically in the fall of 2009 when Demme told everyone they'd keep their businesses and be more profitable); by fraud on the Copyright Office; by fraud on the public by claiming false authorship.

228.   It would be inequitable for MUS and Demme to retain the benefits that Angle conferred on them without payment to Angle for the value by which they have been wrongfully enriched.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court grant the following relief:

(a)   Actual damages on the counts other than copyright counts in an amount to be determined at trial;

(b)   An award of damages to Lisa Angle for Defendants' copyright infringement according to 17 U.S.C. § 504;

(c)   An award of punitive damages to the extent appropriate;

(d)   An award of attorneys fees to the extent appropriate;

(e)   A preliminary and permanent injunction against the Defendants prohibiting any additional or further reproduction or exploitation of Lisa Angle's Works without her consent;

(f)   An order to account for and relinquish to Angle all direct and indirect gains, profits, and advantages derived from Defendants' exploitation of Angle's Works;

(g)   Costs, interest and expenses; and

(h)   Such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

Dated:  June 3, 2011

Respectfully submitted,


SOPKO, NUSSBAUM, INABNIT & KACZMAREK


By: _____
Brent E. Inabnit, #17387-71
Joshua A. Visser, #25144-64
5th Floor - Plaza Building
210 South Michigan Street
Post Office Box 300
South Bend, Indiana  46624
Telephone: (574) 234-3000
Facsimile: (574) 234-422
brenti@sni-law.com
joshv@sni-law.com

And

W. MICHAEL GARNER, P.A.
W. Michael Garner
222 South 9th Street
Suite 2930
Minneapolis, MN  55402
Phone:  (612) 259-4800
Fax:  (612) 259-4810
wmgarner@franchisedealerlaw.com
Attorneys for Plaintiff


Lynch/P/Comp